# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF INDIANA
# FORT WAYNE DIVISION

SHANA M. COLEMAN,          )
)
    Plaintiff,         )
)
    v.          )      **CAUSE NO. 1:12-CV-317**
)
CAROLYN W. COLVIN,[1]     )
Commissioner of Social Security,     )
)
    Defendant.       )

## OPINION AND ORDER

Plaintiff Shana M. Coleman appeals to the district court from a final decision of the Commissioner of Social Security ("Commissioner") denying her application under the Social Security Act (the "Act") for Supplemental Security Income ("SSI") and Disability Insurance Benefits ("DIB").[2] (Docket # 1.) For the following reasons, the Commissioner's decision will be REVERSED, and the case will be REMANDED for further proceedings in accordance with this Opinion.

## I. PROCEDURAL HISTORY

In April 2009, Coleman filed concurrent applications for SSI and DIB, alleging disability since August 19, 2007. (Tr. 163-78.) Her claim was denied initially and upon reconsideration, and Coleman requested an administrative hearing. (Tr. 90-93, 96-98.) Administrative Law Judge ("ALJ") John Pope conducted a video hearing on April 7, 2011, at which Coleman, who was represented by counsel; Rosemary Hunter, her mother; and a vocational expert ("VE") testified.

---

[1] Although Plaintiff brought this suit against Michael J. Astrue, the former Commissioner of Social Security, Carolyn W. Colvin is now the Acting Commissioner. As such, under Federal Rule of Civil Procedure 25(d), Colvin is automatically substituted as a party in place of Astrue. Fed. R. Civ. P. 25(d).

[2] All parties have consented to the Magistrate Judge. (Docket # 14); *see* 28 U.S.C. § 636(c).

(Tr. 1-57.)

On April 29, 2011, the ALJ rendered an unfavorable decision to Coleman, concluding that she was not disabled because she could perform a significant number of jobs in the economy. (Tr. 65-76.)  The Appeals Council denied her request for review, making the ALJ's decision the final decision of the Commissioner. (Tr. 84-89, 154-55, 272-317.)

Coleman filed a complaint with this Court on September 17, 2012, seeking relief from the Commissioner's final decision. (Docket # 1.)  In her appeal, Coleman argues that the ALJ improperly denied her benefits by: (1) failing to properly incorporate his finding at step three that Coleman had a moderate limitation in concentration, persistence, and pace into his hypothetical to the VE; and (2) improperly evaluating the opinion of Coleman's treating psychiatrist, Umamaheswara Kalapatapu, M.D. (Opening Br. of Pl. in Social Security Appeal Pursuant to L.R. 7.3 ("Opening Br.") 19-25.)  Ultimately, although Coleman's first argument is unavailing, her second argument necessitates a remand of the Commissioner's final decision.

## II.  FACTUAL BACKGROUND[3]

### A.  Background

At the time of her alleged onset date, Coleman was twenty-six years old (Tr. 163); had a ninth-grade education (Tr. 7); and no past relevant work experience (Tr. 7-8, 75).  Coleman alleges that she became disabled August 19, 2007 (Tr. 163), due to degenerative disc disease, lower extremity paresthesias, obesity, posttraumatic stress disorder ("PTSD"), depression, and borderline intellectual functioning (Opening Br. 2).  Because Coleman challenges only the ALJ's findings concerning her mental impairments, the Court will focus on the evidence pertaining to

---

[3] In the interest of brevity, this Opinion recounts only the portions of the 1354-page administrative record necessary to the decision.

her mental, rather than physical, limitations.

### B. *Coleman's Testimony at the Hearing*

At the hearing, Coleman testified that she is currently separated from her husband, and lives with her mother at a friend's residence, free of charge. (Tr. 5-6.) Coleman stated that she previously worked briefly in retail and at a grocery store, and currently performs occasional yard work at her residence, but has no other work experience. (Tr. 7-8.) She represented that she has been diagnosed as bipolar, and suffers from PTSD, which derives from allegedly being raped as an adolescent. (Tr. 19, 39.) Coleman also has panic attacks approximately three times a week, and feels that she has a hard time being around people she does not know, especially men. (Tr. 19.) Coleman stated that she has been seeing a psychiatrist, Dr. Kalapatapu, once a month since 2008 (Tr. 20), and a counselor since 2010 or 2011 (Tr. 20-21). Coleman testified that she suffers from anxiety due to her separation from her husband and outstanding medical bills, and is continuously paranoid about being attacked or raped. (Tr. 32-33, 38-41.)

Coleman represented that the side effects from her medication leave her perpetually sleepy and shaky, and that she occasionally suffers bouts of dizziness. (Tr. 14-15.) On a typical day, if Coleman feels good enough to get out of bed, she wakes up around 8:00 a.m., has breakfast, does dishes while seated, folds laundry, and cleans around the house, but has to take breaks every few minutes to lie down. (Tr. 15-16.) Coleman spends the remainder of the day watching television, reading, and talking with her mother. (Tr. 16-17.) She is able to dress and groom herself for the most part. (Tr. 18.) On days Coleman is not feeling well, she is unable to get out of bed or do chores around the house and refuses to socialize. (Tr. 32, 38.)

### C. *Summary of the Relevant Medical Testimony*

From October 2008 to January 2009, Coleman attended anger management classes at the Northeaster Center. (Tr. 518.)  At this time, Coleman stated that she had no previous mental health services, but reported having a history of depression, anxiety, and PTSD. (Tr. 519.)  In a January 2009 Integrated Service Plan Review, Coleman was diagnosed with major depressive disorder, recurrent, moderate; cannabis dependence; and generalized anxiety disorder. (Tr. 518.)  Coleman was assigned a Global Assessment Function ("GAF") of 50 at the time of admission and in January 2009.[4] (Tr. 518-19.)

On February 3, 2009, Dr. Kalapatapu,  performed a psychiatric evaluation. (Tr. 608.)  In the evaluation, Coleman reported a history of depression, anxiety, and bipolar, and psychiatric problems from being raped as an adolescent. (*Id.*)  Dr. Kalapatapu diagnosed Coleman with anxiety disorder, generalized; major depressive disorder, recurrent episode, severe, without mention of psychotic behavior; bipolar disorder, depressed, severe, without mention of psychotic behavior; cannabis dependence, continuous; and PTSD. (Tr. 609.)  He assigned Coleman a GAF of 50 and a highest score in past year of 50. (Tr. 610.)

From February 17, 2009, to March 22, 2011, Coleman saw Dr. Kalapatapu on a monthly

---

[4] GAF scores reflect a clinician's judgment about the individual's overall level of functioning. American Psychiatric Association, DIAGNOSTIC & STATISTICAL MANUAL OF MENTAL DISORDERS 32 (4th ed., Text Rev. 2000). A GAF score of 11-20 reflects behavior that is some danger of hurting self or others (e.g., suicide attempts without clear expectation of death; frequently violent; manic excitement) or occasionally fails to maintain minimal personal hygiene (e.g., smears feces) or gross impairment in communication (e.g., largely incoherent or mute).  A GAF score of 21-30 reflects behavior that is considerably influenced by delusions or hallucinations, a serious impairment in communication or judgment (e.g., sometimes incoherent, acts grossly inappropriately, suicidal preoccupation), or an inability to function in almost all areas (e.g., stays in bed all day; has no job, home, or friends).  A GAF score of 31 to 40 reflects some impairment in reality testing or communication (e.g., speech is at times illogical, obscure, or irrelevant) or a major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood (e.g., avoids friends, neglects family, and is unable to work).  A GAF score of 41 to 50 reflects serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job). *Id.*  A GAF score of 51 to 60 reflects moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers). *Id.*

basis. In connection with each session, Dr. Kalapatapu completed a progress note detailing Coleman's behavior, how she performed on mental status examination, and what her medication plan was. (*See, e.g.*, Tr. 617.) Because Dr. Kalapatapu's progress notes are the focus of one of Coleman's arguments on appeal, the important aspects of each note will be set forth in detail.

On February 17, 2009, Coleman reported she was still anxious and depressed, and Dr. Kalapatapu increased her medication dosage. (*Id.*) On March 3, 2009, Coleman's medication was helping her anxiety and depression. (Tr. 616.) On March, 31, 2009, Coleman was anxious and wanted an increase in Xanax, which was denied; she was instead prescribed oxymorphone. (Tr. 615.) During the April 28, May 12, and May 26, 2009, visits, Coleman was reported as anxious. (Tr. 612-14.) In the May 12, 2009, progress note, Dr. Kalapatapu reported that Coleman had been hospitalized for breathing problems. (Tr. 613.)

This hospitalization occurred on May 6, 2009, after paramedics and police were dispatched to Coleman's house in response to a call that she had been upset, drinking heavily, taking pills, and threatening suicide. (Tr. 714.) Coleman was admitted to St. Joseph Hospital and was unresponsive upon arrival. (*Id.*) Coleman's drug screening came back positive for opiates, benzodiazepines, and amphetamines; she had an elevated blood alcohol level; and was diagnosed with acute alcohol and opiate intoxication, and a history of depression. (Tr. 716-17.) In response to her suspected suicide attempt, Coleman was admitted to the Behavioral Health Unit the following day. (Tr. 818.) Her GAF on admission was 10 to 20, and 40 to 50 on discharge, and she was diagnosed with depressive disorder not otherwise specified, polysubstance abuse, and cannabis dependence. (Tr. 821, 823.) Coleman denied any active suicidal ideation. (Tr. 822.)

On May 27, 2009, Toni Slusser, R.N., completed a report of psychiatric status at the

request of the Social Security Administration ("SSA"), which was countersigned by Dr. Kalapatapu. (Tr. 803-08.) Ms. Slusser repeated Coleman's diagnosis from the February 3, 2009, psychiatric evaluation (which was also attached to the report), stating Coleman had been diagnosed with bipolar disorder, depressed, severe, without psychosis; major depression, recurrent, severe, without psychosis; anxiety disorder generalized; PTSD, had a GAF of 50, and her highest GAF in the past year was 50. (Tr. 803.)

In July 2009, Neal Davidson, Ph.D., L.P., performed a consultative psychological evaluation at the request of SSA. (Tr. 869-78.) On mental status examination, Coleman exhibited low self-image, and poor insight and judgment; had recurrent fears about being attacked by her rapist; and had occasional suicidal thoughts, but did not have an active plan to kill herself. (Tr. 873.) She was diagnosed with PTSD, chronic; major depressive disorder, recurrent, mild; borderline intellectual functioning; and assigned a GAF of 58. (Tr. 875.) Dr. Davidson opined that Coleman is able to understand, remember, and follow simple directions; maintain attention and concentration for extended periods; sustain routine without supervision, but may struggle working in proximity with others without being distracted; and has an adequate ability to interact appropriately with others. (*Id*.)

In July 2009, Maura Clark, Ph.D., completed a Psychiatric Review Technique form and a Mental Residual Functional Capacity Assessment at the request of SSA. (Tr. 879-96.) Dr. Clark found Coleman had moderate limitations in the following areas: ability to understand and remember detailed instructions; ability to carry out detailed instructions; ability to work in coordination or proximity to others without being distracted; and ability to complete a normal workweek without interruptions from psychologically based symptoms and to perform at a

consistent pace without an unreasonable number and length of rest period. (Tr. 879-80.)  Dr.

Clark found that Coleman was not significantly limited in any other area of understanding and

memory, sustained concentration and pace, social interaction, or adaptation. (Tr. 879-80.)  Dr.

Clark assigned Coleman a GAF of 58; and diagnosed her with PTSD, chronic; major depressive

disorder, recurrent, mild; and borderline intellectual functioning. (Tr. 881.)

In the Psychiatric Review Technique, Dr. Clark found Coleman had a mild restriction of

activities of daily living, mild difficulty in maintaining social functioning, and moderate

difficulty in maintaining concentration, persistence, or pace. (Tr. 893.)  In December 2009,

William Shipley, Ph.D., reviewed and affirmed Dr. Clark's findings. (Tr. 1019.)

Returning to Dr. Kalapatapu's progress notes, on June 23, 2009, Coleman was still

anxious and requested an increase in her Xanax dosage, which was denied. (Tr. 1163.)  The July

14, August 18, and September 15, 2009, progress notes indicate Coleman was "manageable"

with no issues. (Tr. 1160-62.)  On October 13, 2009, Coleman was "manageable," but anxious at

times. (Tr. 1159.)  On November 10, 2009, Coleman was anxious and her current medication

was not helping, and therefore, was prescribed Klonopin and Prozac. (Tr. 1158.)  On December

6, 2009, Coleman's medications were still not helping, and she was taken off Xanax and

Cymbalta and prescribed Effexor and Valium. (Tr. 1157.)  On mental status examination,

Coleman was anxious and had a constricted affect. (*Id.*)

The January 12, February 23, March 23, and April 27, 2010, progress notes indicate

Coleman was doing well with her medication. (Tr. 1153-56.)  On June 1, 2010, Coleman was

reported as "manageable," but having anxiety and crying bouts due to problems with money and

her husband's health, and had a constricted affect on mental status examination. (Tr. 1151.)  On

July 13, 2010, Coleman was "manageable," but stressed with anxiety and nervous on mental status examination; she was taken off Valium and prescribed Xanax. (Tr. 1149.) On August 10, 2010, Coleman was "manageable," but stressed with anxiety and reported difficulty interacting socially, and had recurrent nightmares of being abused. (Tr. 1318.) On mental status examination, Coleman had a constricted affect and her behavior was described as "crying." (*Id*.)

On September 2, 2010, Dr. Kalapatapu completed a Mental Impairment Questionnaire and Medical Source Statement of Ability to do Work-Related Activities (Mental) at the request of SSA. (Tr. 1203-08.) Dr. Kalapatapu stated that he saw Coleman with the frequency consistent with the accepted medical practice, and diagnosed her with bipolar disorder, depressed, severe, without psychosis; major depression, functioning difficulties; anxiety disorder; PTSD; and assessed a current GAF of 50, and highest GAF in the past year of 50. (Tr. 1203.) Coleman was reported having a constricted affect, depressed or frustrated behavior, but did not suffer from hallucinations or delusions, and was not suicidal or homicidal. (Tr. 1204.) He stated that Coleman would miss more than four days a month from work due to her mental impairments, and that her mental functioning would decrease if she returned to full-time work. (Tr. 1206.)

Dr. Kalapatapu assessed that Coleman had poor ability to respond to the following activities: perform activities within a schedule, maintain regular attendance and be punctual; sustain an ordinary routine without special supervision; work, with or near others without being distracted by them; complete a normal workday or workweek; perform at a consistent pace; respond appropriate to changes in the work setting; travel in unfamiliar places or use public transportation; and set realistic goals or make plans independently of others. (*Id.*)

The September 14, 2010, progress note indicates Coleman was "manageable" and that

her treatment plan was to "maintain control of anxiety and depressive." (Tr. 1316.)  On September 29, 2013, Coleman was seen for counseling at Dr. Kalapatapu's clinic by G. McKinney, MS Ed. (Tr. 1315.)  The record indicates that Coleman was separated from her husband, her levels of depression and anxiety were an eight on a ten-point scale, and that she had nightmares and a fear of being in environments with unfamiliar males. (Tr. 1315.)

The October 12, 2010, progress note indicates that Coleman was not doing well with her current medication. (Tr. 1312.)  The December 7, 2010, progress note indicates Coleman was recently in the hospital, and was highly depressed and anxious because she was unable to celebrate Christmas. (Tr. 1310.)  The January 21, 2011, progress note indicates Coleman was unable to attend the session because she was in the hospital with cellulitis, but was feeling better. (Tr. 1308.)  The February 5, 2011, progress note sets out a longer treatment plan, stating "monthly visits to monitor effectiveness and side effects- duration 3 years; support given; Xanax reduction 12/7/10; therapy with Greta." (Tr. 1307.)  The March 22, 2011, progress note indicates Coleman was "very depressed.  Getting close to the disability hearing, and she is really worried. Separated from her husband." (Tr. 1304.)  On mental status examination, Coleman had a depressed affect, and worrisome behavior. (*Id*.)

### III.  STANDARD OF REVIEW

Section 405(g) of the Act grants this Court "the power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the [Commissioner], with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). The Court's task is limited to determining whether the ALJ's factual findings are supported by substantial evidence, which means "such relevant evidence as a reasonable mind might accept as

adequate to support a conclusion." *Schmidt v. Barnhart*, 395 F.3d 737, 744 (7th Cir. 2005)

(citation omitted).  The decision will be reversed only if it is not supported by substantial

evidence or if the ALJ applied an erroneous legal standard. *Clifford v. Apfel*, 227 F.3d 863, 869

(7th Cir. 2000).

To determine if substantial evidence exists, the Court reviews the entire administrative

record, but does not "reweigh the evidence, resolve conflicts, decide questions of credibility," or

substitute its judgment for the Commissioner's. *Id.*  Rather, if the findings of the Commissioner

are supported by substantial evidence, they are conclusive. *Jens v. Barnhart*, 347 F.3d 209, 212

(7th Cir. 2003).  Nonetheless, "substantial evidence" review should not be a simple rubber-stamp

of the Commissioner's decision. *Clifford*, 227 F.3d at 869.

## IV.  ANALYSIS

### A.  The Law

Under the Act, a claimant is entitled to DIB or SSI if she establishes an "inability to

engage in any substantial gainful activity by reason of any medically determinable physical or

mental impairment which can be expected to . . . last for a continuous period of not less than 12

months." 42 U.S.C. §§ 416(i)(1), 423(d)(1)(A), 1382c(a)(3)(A).  A physical or mental

impairment is "an impairment that results from anatomical, physiological, or psychological

abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic

techniques." 42 U.S.C. §§ 423(d)(3), 1382c(a)(3)(D).

The Commissioner evaluates disability claims pursuant to a five-step evaluation process,

requiring consideration of the following issues, in sequence: (1) whether the claimant is currently

unemployed; (2) whether the claimant has a severe impairment; (3) whether the claimant's

impairment meets or equals one of the impairments listed by the Commissioner, *see* 20 C.F.R. §

404, Subpt. P, App. 1; (4) whether the claimant is unable to perform her past work; and (5)

whether the claimant is incapable of performing work in the national economy.[5] *See Dixon v.*

*Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001); 20 C.F.R. §§ 404.1520, 416.920. An

affirmative answer leads either to the next step or, on steps three and five, to a finding that the

claimant is disabled. *Zurawski v. Halter*, 245 F.3d 881, 886 (7th Cir. 2001). A negative answer

at any point other than step three stops the inquiry and leads to a finding that the claimant is not

disabled. *Id.* The burden of proof lies with the claimant at every step except the fifth, where it

shifts to the Commissioner. *Clifford*, 227 F.3d at 868.

## B.  The ALJ's Decision

On April 29, 2011, the ALJ issued the decision that ultimately became the

Commissioner's final decision. (Tr. 65-76.) He noted at step one that Coleman had not engaged

in substantial gainful activity after her alleged onset date, and at step two that she had the

following severe impairments: degenerative disc disease, lower extremity paresthesias, obesity,

PTSD, depression, borderline intellectual functioning, and substance addiction disorder. (Tr. 67.)

At step three, the ALJ determined that Coleman's impairment or combination of impairments

were not severe enough to meet a listing. (Tr. 67-69.)

Before proceeding to step four, the ALJ determined that Coleman's symptom testimony

was not reliable to the extent it was inconsistent with the following RFC:

The claimant has the residual functional capacity to perform sedentary work . . . ,

---

[5] Before performing steps four and five, the ALJ must determine the claimant's RFC or what tasks the
claimant can do despite her limitations. 20 C.F.R §§ 404.1520(e), 404.1545(a), 416.920(e), 416.945(a). The RFC is
then used during steps four and five to help determine what, if any, employment the claimant is capable of. 20 C.F.R.
§§ 404.1520(e), 416.920(e).

> except must use a cane to ambulate; should never climb ladders, ropes, or scaffolds; should only occasionally climb ramps and stairs, balance, stoop, kneel, crouch, and crawl; should avoid concentrated exposure to wetness and hazards; and is limited to skilled, simple, repetitive work.

(Tr. 69.)  Coleman had no past relevant work to consider at step four. (Tr. 75.)  Based on this RFC and the VE's testimony, the ALJ found at step five that Coleman could perform a significant number of jobs in the economy, including order clerk, information clerk, and assembler/inspector. (Tr. 75-76.)  Accordingly, Coleman's claims for DIB and SSI were denied. (Tr. 76.)

### C. The ALJ's Hypothetical Properly Incorporated Coleman's Medical Limitations

On appeal, Coleman first argues that the ALJ's hypothetical to the VE failed to incorporate each of her medical limitations as required under *O'Connor-Spinner v. Astrue*, 627 F.3d 614, 620 (7th Cir. 2010).  Specifically, Coleman argues that because the ALJ found she had a moderate limitation in concentration, persistence, or pace during his special technique at step three, the same limitations must also be incorporated into his hypothetical to the VE.

Coleman's argument is based on an overly broad reading of *O'Connor-Spinner* and that case's applicability to stage three special technique determinations.  In *O'Connor-Spinner* the ALJ's RFC determination included a finding that the claimant had a limitation on her concentration, persistence, and pace; however, this limitation was not included in the hypothetical posed to the VE. *Id.* at 618-19.  The Court reversed and remanded because the ALJ failed to incorporate all of the mental limitations assigned in the RFC into the hypothetical posed to the VE. *Id.* at 620-21.  Here, conversely, the RFC assigned by the ALJ contained no limitation on Coleman's concentration, persistence, and pace. (Tr. 69.)  Accordingly, the ALJ's hypothetical to the VE did not contain a limitation on Coleman's concentration, persistence, and

pace. The fact that the ALJ found a limitation on Coleman's concentration, persistence, and pace during his special technique determination at stage three is not determinative of his RFC findings; thus *O'Connor-Spinner* is not dispositive to the case at bar.

To elaborate, the ALJ's special technique findings at step three are separate and distinct from the medical limitations set forth in an RFC, which in turn, must be incorporated into the hypothetical to the VE. At steps two and three of the sequential evaluation, the ALJ determines the severity of a claimant's mental impairment by assessing her degree of functional limitation in categories identified in the "paragraph B" and "paragraph C" criteria of the adult mental disorders listings. SSR 96-8p, 1996 WL 374184, at *4. Relevant to this appeal, the "paragraph B" criteria consist of four "broad functional areas": activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation. 20 C.F.R. §§ 404.1520a(c)(3), 416.920a(c)(3); *see, e.g.*, *Jones v. Massanari*, No. 01-C-0024-C, 2001 WL 34382025, at *13 (W.D. Wis. Oct. 18, 2001). "[T]he limitations identified in the 'paragraph B' and 'paragraph C' criteria are not an RFC assessment but are used to rate the severity of mental impairment(s) at steps 2 and 3 of the sequential evaluation process." SSR 96-8p, 1996 WL 374184, at *4.

"The mental RFC assessment used at steps 4 and 5 of the sequential evaluation process requires a more detailed assessment by itemizing various functions contained in the broad categories found in paragraphs B and C . . . ." *Id.*; *see Virden v. Astrue*, No. 11-0189-DRH-CJP, 2011 WL 5877233, at *9 (S.D. Ind. Nov. 4, 2011). "RFC is what an individual can still do despite his or her limitations." SSR 96-8p, 1996 WL 374184, at *2; *see* 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1). "The RFC assessment must be based on *all* of the relevant

evidence in the case record." SSR 96-8p, 1996 WL 374184, at *5 (emphasis in original); *see* 20 C.F.R. §§ 404.1545(a)(3), 416.945(a)(3). That is, "[i]n assessing RFC, the adjudicator must consider limitations and restrictions imposed by all of an individual's impairments, even those that are not 'severe.'" SSR 96-8p, 1996 WL 374184, at *5; *see Paar v. Astrue*, No. 09 C 5169, 2012 WL 123596, at *13 (N.D. Ill. Jan. 17, 2012).

Here, when assessing the "paragraph B" criteria at steps two and three, the ALJ concluded that Coleman had "moderate difficulties" in concentration, persistence, or pace. (Tr. 68.) Then, assigning an RFC, the ALJ stated:

> The claimant has the residual functional capacity to perform sedentary work . . . , except must use a cane to ambulate; should never climb ladders, ropes, or scaffolds; should only occasionally climb ramps and stairs, balance, stoop, kneel, crouch, and crawl; should avoid concentrated exposure to wetness and hazards; and is limited to skilled, simple, repetitive work.

(Tr. 69.)

Contrary to Coleman's assertion, the ALJ adequately accounted for her deficiencies in maintaining concentration, persistence, or pace in the RFC (which was then incorporated into the hypothetical posed to the VE) because the RFC is supported by the opinions of Drs. Davidson and Clark, both of which the ALJ assigned "great weight." (Tr. 73-74.) To review, Dr. Clark conducted a mental RFC and concluded that although Coleman had moderate difficulties in her ability to understand and remember detailed instructions, carry out detailed instructions, work in coordination with or proximity to others without distraction, and complete a normal workday without interruptions from psychologically-based symptoms, she was "not significantly limited" in the remaining sixteen mental-activity categories. (Tr. 879-80.) Accordingly, Dr. Clark concluded, "[w]hile it is expected that the [Coleman] would be unable to complete complex

tasks, [she] is able to complete only repetitive tasks on a sustained basis without special consideration to the extent her physical condition permits." (Tr. 881.) Dr. Davidson, likewise, concluded that Coleman "is able to understand, remember, and follow simple directions and maintain attention and concentration for extended periods." (Tr. 875.)

The instant circumstances are analogous to the facts confronting the Seventh Circuit in *Johansen v. Barnhart*, 314 F.3d 283, 288-89 (7th Cir. 2010). There, the ALJ determined that the claimant was moderately limited in his ability to maintain a regular schedule and attendance and in his ability to complete a normal workday and workweek without interruptions from psychologically-based symptoms. *Id.* In posing a hypothetical to the VE, the ALJ relied upon the opinion of a consulting physician who stated that because the claimant was not significantly limited in seventeen of twenty work-related areas of mental functioning, he retained the mental RFC to perform "low-stress, repetitive work." *Id.* The Court of Appeals concluded that the ALJ's limitation to low-stress, repetitive work adequately incorporated Johansen's moderate mental limitations, articulating that the consulting physician had essentially "translated [his] findings into a specific RFC assessment, concluding that Johansen could still perform low-stress, repetitive work." *Id.*; *see also Milliken v. Astrue,* 397 F. App'x 218, 221-22 (7th Cir. 2010) (unpublished) (affirming ALJ's step five finding where a medical expert opined that despite claimant's difficulties in social functioning and concentration, persistence, or pace, she could still perform unskilled work).

Here, like the consulting physician in *Johansen*, Drs. Davidson and Clark "translated [their] findings into a specific RFC assessment." 314 F.3d at 288. The ALJ then relied on Drs. Clark's and Davidson's translation in assigning Coleman's RFC; limiting her to skilled, simple,

repetitive work. (Tr. 69.)

To reiterate, an ALJ "is free to formulate his mental residual functional capacity assessment in terms such as 'able to perform simple, routine, repetitive work' so long as the record adequately supports that conclusion." *Kusilek v. Barnhart*, No. 04-C-310-C, 2005 WL 567816, at *4 (W.D. Wis. Mar. 2, 2005); *see Johansen*, 314 F.3d at 289 ("All that is required is that the hypothetical question [to the VE] be supported by the medical evidence in the record" (quoting *Meredith v. Bowen*, 833 F.2d 650, 654 (7th Cir. 1987))). The record, in particular, Drs. Davidson's and Clark's opinions, adequately supports the RFC assigned by the ALJ, and thus substantial evidence supports the ALJ's step-five finding. As a result, Coleman's argument—that the RFC and the hypothetical posed to the ALJ at step five did not account for her moderate difficulties in concentration, persistence, or pace—does not warrant a remand.

### D. The ALJ Improperly Discounted Dr. Kalapatapu's Opinion

Coleman next argues that the ALJ improperly evaluated Dr. Kalapatapu's opinion, and that the reasons given by the ALJ for discounting the opinion are contrary to the record, inadequately explained, and legally insufficient; and moreover, the ALJ did not adequately address the required checklist of factors when deciding what weight to give Dr. Kalapatapu's opinion. Coleman's argument has merit as the ALJ's opinion shows that his review of Dr. Kalapatapu's opinion was incomplete and insufficiently explained.

A treating physician's opinion is entitled to controlling weight if it is "well-supported" and "not inconsistent with the other substantial evidence" in the record. *Scott v. Astrue*, 647 F.3d 734, 739 (7th Cir. 2011) (citing 20 C.F.R. § 404.1527(d)(2)). "The treating physician's opinion is important because that doctor has been able to observe the claimant over an extended period of

16

time, but it may also be unreliable if the doctor is sympathetic with the patient and thus 'too quickly find[s] disability.'" *Ketelboeter v. Astrue*, 550 F.3d 620, 625 (7th Cir. 2008) (citation omitted) (alteration in original). As such, if the treating physician's opinion is internally inconsistent, based solely on complainant's subjective complaints, or inconsistent with the consulting physician's opinion, the ALJ may discount it. *Id.*; *see White v. Barnhart*, 415 F.3d 654, 659 (7th Cir. 2005).

In the event the treating physician's opinion is not well-supported or is inconsistent with other substantial evidence, "the rule drops out and the treating physician's evidence is just one more piece of evidence for the [ALJ] to weigh." *Hofslien v. Barnhart*, 439 F.3d 375, 377 (7th Cir. 2006). In determining the weight to give the treating physician's opinion, the ALJ should consider: (1) the length of the treatment relationship and frequency of examination; (2) the nature and extent of the treatment relationship; (3) how much supporting evidence is provided; (4) the consistency between the opinion and the record as a whole; (5) whether the treating physician is a specialist; and (6) any other factors brought to the attention of the Commissioner. *Larson v. Astrue*, 615 F.3d 744, 751 (7th Cir. 2010); 20 C.F.R. §§ 404.1527(d), 416.927(d).

Furthermore, contrary to many eager claimant's arguments, a claimant is not entitled to DIB or SSI simply because her treating physician states that she is "unable to work" or "disabled," because "a treating physician may bring biases to an assessment." *Dixon v. Massanari*, 270 F.3d 1171, 1177 (7th Cir. 2001). The Commissioner, not a doctor selected by a patient to treat her, decides whether a claimant is disabled. *Id.*; 20 C.F.R. §§ 404.1527(e)(1), 416.927(e)(1). Regardless of the outcome, the Commissioner must always give good reasons for the weight ultimately applied to the treating source's opinion. *Martinez v. Astrue*, 630 F.3d 693,

698 (7th Cir. 2011); 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2).

When reviewing the medical evidence in order to determine Coleman's RFC, the ALJ gave "little weight" to Dr. Kalapatapu's opinion because (1) "the medical evidence shows very limited treatment," as it appears Coleman was evaluated "only on rare occasions" as most visits were limited to medication management; (2) the record is unclear on whether Dr. Kalapatapu, as opposed to someone on his staff, treated Coleman; and (3) Dr. Kalapatapu's progress notes are inconsistent with the findings he reported to Medicaid. (Tr. 74.) Although the ALJ devoted two paragraphs of his opinion to Dr. Kalapatapu, his analysis is based on an incomplete review, and his reasons for discounting the opinion are insufficiently explained and contrary to the record.

First, although the ALJ considered the length of treatment and frequency of examination as required under the checklist of factors, his analysis was based on an incomplete review of the record. The ALJ contends that Coleman saw Dr. Kalapatapu nineteen times from February 19, 2009, to July 13, 2010, and that "[t]here [were] no other treatment notes in the file." (Tr. 74.) This is untrue, however, as the record shows that the ALJ ignored eight months–from August 2010 to March 2011 (Tr. 1304-18)–of Dr. Kalapatapu's progress notes. (Tr. 74.)

Because the ALJ omitted eight months of Coleman's psychiatric counseling from his review, his assessment of Dr. Kalapatapu's opinion was necessarily incomplete and distorted. The progress notes from these unexamined months evidence a more thorough treatment than that suggested by the ALJ as they include findings that, Coleman was "unable to handle people including husband, has nightmares of abuse that happened when she was 11 yrs" (Tr. 1318), was having trouble adjusting to her medication (Tr. 1312), had been in the hospital and "has a lot of depression and anxiety" (Tr. 1310), and was "very depressed" (Tr. 1304). These unexamined

18

progress notes evidence a level of treatment beyond mere medication management, and although on remand the ALJ is certainly entitled to still discount Dr. Kalapatapu's opinion, it can only be discounted after a complete a complete review of the record. *See Robben-Cyl v. Astrue*, No. 11 C 7501, 2013 WL 2951995, at *10 (N.D. Ill. Feb. 6, 2013) (improper rejection of treating physician's opinion because ALJ's conclusions contained factual inaccuracies).

Next, it is unclear from the record and the ALJ's opinion why the ALJ determined that Dr. Kalapatapu rarely evaluated Coleman and treatment was limited to medication management. To begin with, Dr. Kalapatapu indicated in a Mental Impairment Questionnaire that he saw Coleman "with the frequency consistent with the accepted medical practice type of treatment and/or evaluation required for [her] medical conditions." (Tr. 1203.) For the ALJ to conclude otherwise–without so much as an explanation why–is contrary to his requirements under 20 C.F.R. §§ 404.1527(d) and 416.927(d). *See Day v. Astrue*, 334 F. App'x 1, 7-8 (7th Cir. 2009) (unpublished) (reversing the ALJ because he failed to support his reasoning for discounting the treating physician's opinion with "substantial evidence" and failed to apply the correct legal standards); *Sanders v. Astrue*, 894 F. Supp. 2d 1100, 1105 (N.D. Ind. 2012) (reversing the ALJ because he "ran afoul of regulations: he failed to consider properly all the factors identified in the SSI regulations when deciding how much weight to afford [the treating physician's] opinion").

Moreover, Dr. Kalapatapu's progress notes indicate that he performed a mental status examination, medication management, and an assessment on Coleman's behavior that was then written into the "Data" section of each progress note. Although the progress notes are by no means highly detailed, the ALJ has not explained why or how they are deficient. *See Carter v.*

19

*Colvin*, No. 4:12-cv-75, 2013 WL 5303744, at *2 (S.D. Ind. Sept. 19, 2013) (reversing the ALJ's decision because he failed to explain his reasoning for concluding a treating physician's questionnaire should be rejected); *Ellis v. Astrue*, No. 2:10-CV-452, 2012 WL 359305, at *10 (N.D. Ind. Feb. 2, 2012) ("The court will not speculate on the basis of the ALJ's opinion.").

Additionally, the ALJ's grounds for questioning whether Dr. Kalapatapu performed Coleman's medication management are ill-conceived. The ALJ explains that because Toni Slusser, R.N., a member of Dr. Kalapatapu's staff, filled out and signed a request for information from the Social Security administration, and that because this request was only countersigned by Dr. Kalapatapu, it is therefore unclear what Dr. Kalapatapu's role was in Coleman's treatment. Such a giant inferential leap is wholly without support. *Cf. Adams v. Astrue*, No. 2:08 cv 79, 2009 WL 2986966, at *10 (N.D. Ind. Sept. 14, 2009) ("SSR 82-62 provides that an ALJ may draw reasonable inferences, but presumptions, speculations, and suppositions must not be drawn."). The request for information filled out by Ms. Slusser refers to the psychiatric evaluation performed by Dr. Kalapatapu on February 3, 2009, and in fact, attached that psychiatric evaluation to the form. As such, the fact that Ms. Slusser filled out the request for information form provides no indication that Dr. Kalapatapu's role in Coleman's treatment was limited. Instead, it simply shows that Ms. Slusser filled out a form relying entirely on Dr. Kalapatapu's previous evaluation. Moreover, each progress note is electronically signed by Dr. Kalapatapu, and there is no indication any other personnel was involved in Coleman's treatment. For the ALJ to conclude otherwise, without sufficient explanation or support from the record, is legally inadequate. *See Kinley v. Astrue*, 1:12-CV-740, 2013 WL 494122, at *6 (S.D. Ind. Feb. 8, 2013) (reversing the ALJ's decision because his reasoning for discounting the treating

physician's opinion was contrary to the record and because the ALJ failed to build a logical bridge from the evidence to his conclusion); *see also Denton v. Astrue*, 596 F.3d 419, 425 (7th Cir. 2010) ("[A]n ALJ has the obligation to consider all relevant medical evidence and cannot simply cherry-pick facts that support a finding of non-disability while ignoring evidence that points to a disability finding.").[6]

On remand, the ALJ is encouraged to consider the fact that Kalapatapu's opinion "was the most recent professional word on [Coleman's] mental impairments, by a treating psychiatrist who had seen her repeatedly over a two-year period with full access to her complete medical record to that point." *Jelinek v. Astrue*, 662 F.3d 805, 812 (7th Cir. 2011). In contrast to Dr. Kalapatapu, who was treating Coleman and conducting mental status examinations up through March 2011, the state agency psychologists rendered their opinions in July 2009. *See, e.g.*, *id.* (finding in that instance that the ALJ would be "hard-pressed to justify casting aside" the treating physician's opinion in favor of state-agency opinions that were two years old); *see Eakin v. Astrue*, 432 F. App'x 607, 612 (7th Cir. 2011) (unpublished) (concluding that claimant's treating physician's opinion was entitled to considerable weight were the doctor had treated the claimant four times over a two-year period).

## V. CONCLUSION

For the reasons articulated herein, the decision of the Commissioner is REVERSED, and

---

[6] Because the case is being remanded on the grounds that the ALJ failed to adequately review Coleman's entire medical history with Dr. Kalapatapu, and impermissibly speculated on the scope of Dr. Kalapatapu's treatment, the Court does not decide the issue of whether Dr. Kalapatapu's progress notes are inconsistent with a Medicaid form he filled out on Coleman's behalf. On remand, the ALJ is encouraged to consider the line of cases finding that "[a] person who has a chronic disease, whether physical or psychiatric, and is under continuous treatment for it with heavy drugs, is likely to have better days and worse days." *Bauer v. Astrue*, 532 F.3d 606, 609 (7th Cir. 2008); *Punzio v. Astrue*, 630 F.3d 704, 710 (7th Cir. 2011) ("[A] person who suffers from a mental illness will have better days and worse days, so a snapshot of any single moment says little about her overall condition.").

the case is REMANDED to the Commissioner for further proceedings in accordance with this Opinion and Order. The Clerk is directed to enter a judgment in favor of Coleman and against the Commissioner.

SO ORDERED.

Enter for this 29th day of January, 2014.

S/Roger B. Cosbey
Roger B. Cosbey,
United States Magistrate Judge